UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------- X

RICHARD SNYDER,

               **Plaintiff,**

       **- against -**

WELLS FARGO BANK, N.A. as
successor to WACHOVIA BANK, N.A.,

             **Defendant.**

------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _12/19/11_

**OPINION AND ORDER**

**11 Civ. 4496 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

      Richard Snyder, a retired businessman, brings this action against

Wells Fargo Bank, N.A. ("Wells Fargo"), as successor to Wachovia Bank, N.A.

("Wachovia"), for Wachovia's alleged mismanagement of Snyder's personal and

retirement investment accounts.  Snyder accuses Wachovia of (1) breach of

contract, (2) breach of fiduciary duty, (3) negligence, and (4) unjust enrichment in

connection with Wachovia's alleged failure to abide by the parties' agreements

concerning Snyder's accounts as well as Wachovia's alleged failure to exercise

reasonable skill and care in managing his accounts.  Wells Fargo now moves to

compel arbitration pursuant to the parties' agreement and stay any further action in

1

this Court pending the arbitration.  For the following reasons, Wells Fargo's

motion is denied in part and granted in part.

## II.     BACKGROUND

### A.     The Parties' History

Snyder is a retired businessman residing in New York.[1]  Snyder began

to use Wachovia's services in 2008.[2]  By 2010, Wachovia merged into Wells

Fargo, a national banking association with its principal place of business in Sioux

Falls, South Dakota.[3]

In mid-2008, Snyder, then seventy-five years old, had a significant

investment portfolio and was concerned about a potential downturn in the stock

market.[4]  At that time, Snyder's investments had been managed by Greenhaven

Associates ("Greenhaven") for about twenty years.[5]  However, after discussions

with Greenhaven concerning Snyder's belief that his portfolio was overinvested in

certain securities, Snyder decided to seek a new investment advisor.[6]

---

[1]      *See* Complaint ("Compl.") ¶ 4.

[2]      *See id.* ¶ 13.

[3]      *See id.* ¶¶ 7-8.

[4]      *See id.* ¶ 10.

[5]      *See id.* ¶ 11.

[6]      *See id.* ¶ 12.

In June 2008, Snyder met with Wachovia representatives including Tony Rogers, an investment strategist, and Maria Cianci, a relationships manager, to discuss working with Wachovia.[7]  Rogers and Cianci represented themselves to be highly skilled investment advisors capable of addressing Snyder's "concerns about the stock market."[8]  During this and subsequent meetings, Snyder provided Wachovia with "his detailed financial situation and personal circumstances."[9] Snyder informed the Wachovia representatives that his investment objective was the preservation and protection of his wealth including a plan for Wachovia to "implement an investment strategy to re-allocate and diversify his investment portfolio."[10]  Snyder also informed the representatives that he wanted such a plan implemented immediately to avoid significant risks if the stock market were to suffer a downturn.[11]  The Wachovia representatives promised to do this.[12]

In July 2008, Wachovia representatives presented Snyder with a proposal of Wachovia's recommended asset allocation for Snyder's investment

---

[7]     *See id.* ¶ 13.

[8]     *Id.* ¶ 14.

[9]     *Id.* ¶ 17.

[10]     *Id.* ¶ 18.

[11]     *See id.* ¶¶ 19-20.

[12]     *See id.* ¶ 21.

portfolio — the Recommended Wealth Advantage Portfolio (the "Proposal").[13]
The Wachovia representatives informed Snyder that the Proposal was a detailed
plan for the re-allocation and diversification of Snyder's portfolio and that it was
tailored to meet Snyder's financial and personal needs.[14]  They also informed
Snyder that this plan "was tailored to allay Snyder's concerns about a decline in the
stock market and the significant stock market risk to his then-existing investment
portfolio."[15]  Based on these representations, Snyder decided to retain Wachovia.[16]

**B.  The Agreements**

On July 31, 2008, Snyder met with Wachovia representatives
including Rogers and Cianci in his Manhattan home and entered into two
agreements with Wachovia.[17]  First, Snyder entered into the Investment
Management Agreement ("IMA") under which Wachovia was to manage Snyder's
general investment portfolio.[18]  The IMA provided that "[t]his Agreement shall be

---

[13]    *See id.* ¶ 22.

[14]    *See id.* ¶¶ 23-24.

[15]    *Id.* ¶ 25.

[16]    *See id.* ¶ 29.

[17]    *See id.*

[18]    *See id.*; *see also* 7/31/08 Investment Management Agreement
("IMA"), Ex. C to 10/5/11 Declaration of Michael P. Manning, defendant's
counsel, ("Manning Decl.").

4

construed and enforced in accordance with the laws of . . . N.Y."[19]  Snyder also entered into an agreement concerning his Individual Retirement Account ("IRA").[20]  The IRA agreement gave Wachovia control over Snyder's IRA and further provided that "disputes between the parties to this agreement shall first be submitted to private binding arbitration at the demand of either party."[21]  Under both the IMA and IRA agreement, Wachovia had a fiduciary duty to implement an appropriate investment strategy with Snyder's portfolio.[22]  Wachovia was given sole discretion to carry out any such plans.[23]  Both agreements also provided for management fees to be paid to Wachovia for its management, strategy and decisions.[24]

At the time of the agreements, Snyder informed Wachovia that he was leaving on an extended trip out of the country during August 2008, and that he

---

[19]     IMA, article XII.

[20]     *See* Compl. ¶ 29; *see also* 7/31/08 Traditional Individual Retirement Trust Account ("IRA"), Ex. D to Manning Decl.

[21]     IRA ¶ 11.5.

[22]     *See* Compl. ¶ 31.

[23]     *See id.* ¶ 32.

[24]     *See id.* ¶ 34.

expected Wachovia to act immediately on the Proposal while he was gone.[25]  To that end, Snyder transferred all his security holdings from Greenhaven to his Wachovia accounts between August 8 and August 11, 2008.[26]  These assets had a combined value of twelve million dollars.[27]  The assets included fifteen individual stocks as well as $700,000 worth of treasury bills.[28]

### C.    The Alleged Breach

When Snyder returned from his trip in September 2008, he inquired about his accounts at Wachovia.[29]  At that time, Wachovia informed Snyder that it had not yet implemented the Proposal.[30]  Cianci told Snyder that Wachovia had not acted because Snyder had failed to sign an option strategies consent form.[31]  Snyder claims that he was never told about the need to sign an option strategies consent form before Wachovia could implement the Proposal.[32]  On September 9,

---

[25]    *See id.* ¶ 27.

[26]    *See id.* ¶ 35.

[27]    *See id.* ¶ 36.

[28]    *See id.* ¶ 37.

[29]    *See id.* ¶ 45.

[30]    *See id.* ¶ 47.

[31]    *See id.* ¶ 49.

[32]    *See id.* ¶ 52.

2008, Snyder executed an option strategies consent form, and after that time, Wachovia "initiated the selling of a handful of call options on a few stocks."[33]

On September 15, 2008, in response to Snyder's inquiry, Rogers informed Snyder that Wachovia had been monitoring his account, was focusing on his long-term investments, and had decided not to "liquidate all stocks amid this volatile market."[34]  Nonetheless Snyder instructed Wachovia to liquidate certain stock holdings over the next three days, which it did.[35]  By early October, after suffering heavy losses in his portfolio, Snyder instructed Wachovia to transfer his IMA account holdings to another firm because he believed that Wachovia had failed to implement any investment strategy.[36]  In December, Snyder instructed Wachovia to transfer his IRA holdings for the same reason.[37]  Between the time that Snyder transferred his holdings into Wachovia and the time he took them out, the value of his investment portfolio declined by approximately 3.5 million

---

[33]     *Id.* ¶¶ 42, 53.

[34]     *Id.* ¶ 55.  September 15, 2008 was also the date of the announcement of the Lehman Brothers bankruptcy filing, an event causing catastrophic consequences to the stock market — and apparently to Snyder's portfolio.  *See* Defendant's Memorandum of Law in Support of Its Motion to Compel Arbitration at 2.

[35]     *See* Compl. ¶ 56.

[36]     *See id.* ¶ 57.

[37]     *See id.* ¶ 59.

dollars.[38]

Snyder thus alleges that despite the execution of the IMA and IRA agreements as well as the parties' oral understandings that Wachovia would immediately implement a diversifying investment strategy, Wachovia did not take the proper steps to implement the Proposal or otherwise protect his holdings.[39] Wachovia's failure to take any action concerning Snyder's account, he alleges, directly caused the value of his portfolio to decrease greatly between August and December 2008.[40]

**D.    The Present Action**

Beginning on March 5, 2009, Snyder's lawyer contacted Wachovia about his intention to bring suit based on Wachovia's alleged mismanagement of Snyder's accounts.[41]  In subsequent exchanges — spanning over a year and a half — the parties discussed settlement options as well as the possibility of litigation.[42] These negotiations were unsuccessful.

---

[38]    *See id.* ¶ 61.

[39]    *See id.* ¶¶ 38-41.

[40]    *See id.* ¶ 44.

[41]    *See* Exchange of letters between Charles A. Stillman, Snyder's counsel, and Catherine McKnight, Wachovia's counsel, Exs. 1 and 2 to 10/30/11 Declaration of Brian Kennedy, Snyder's counsel.

[42]    *See id.*

In June 2011, Snyder filed this suit claiming that Wachovia's inaction and failure to implement proper investment strategies relating to his account was a breach of contract and breach of fiduciary duty.[43]  Snyder further alleges that Wachovia's inaction constituted negligence and caused Wachovia to be unjustly enriched by virtue of its receipt of management fees.[44]  Wells Fargo now moves to compel arbitration based on the binding arbitration clause contained in the IRA agreement.  Snyder admits that any disputes concerning losses suffered in his IRA must be submitted to arbitration, but he contends that disputes concerning losses suffered in his IMA account are not subject to arbitration.[45]  Snyder further argues that by failing to assert its right to arbitration during the protracted attorney correspondences, Wachovia waived any right it may have had to demand arbitration.[46]

## III.   APPLICABLE LAW

### A.   Arbitrability

The Federal Arbitration Act ("FAA") provides that

---

[43]     *See* Compl. ¶¶ 62-70.

[44]     *See id.* ¶¶ 71-82.

[45]     *See* Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Compel Arbitration ("Pl. Mem.") at 3.

[46]     *See id.* at 6.

9

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement.[47]

The FAA "'requires the federal courts to enforce arbitration agreements, reflecting Congress' recognition that arbitration is to be encouraged as a means of reducing the costs and delays associated with litigation.'"[48]  The strong federal policy favoring arbitration is well-known and "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."[49]

"In deciding whether a dispute is arbitrable, we must answer two questions: (1) 'whether the parties agreed to arbitrate,' and, if so, (2) 'whether the

---

[47]     9 U.S.C. § 3.  *See also id.* § 4 (allowing parties to obtain "an order directing that [an] arbitration proceed").

[48]     *Vera v. Saks & Co.*, 335 F.3d 109, 116 (2d Cir. 2003) (quoting *Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.*, 9 F.3d 1060, 1063 (2d Cir. 1993)).

[49]     *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).  *Accord Granite Rock Co. v. International Bhd. of Teamsters*, — U.S. —, 130 S. Ct. 2847, 2857 (2010); *Guyden v. Aetna, Inc.*, 544 F.3d 376, 382 (2d Cir. 2008).

10

scope of [that] agreement encompasses the claims' at issue."[50]  However, "[a]rbitration is entirely a creature of contract" and "which disputes are subject to arbitration [must be] determined entirely by an agreement between the parties."[51] Thus, "'[a]s with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability.'"[52]

While it is well-settled under New York law that "'where several instruments constitute part of the same transaction, they must be interpreted together,'"[53] an arbitration clause from one contract cannot be applied to another contract unless there is a close "connection between the two contracts at issue" and the arbitration clause in one of the contracts is broad enough to cover the issues in

---

[50]    *Bank Julius Baer & Co., Ltd. v. Waxfield Ltd.*, 424 F.3d 278, 281 (2d Cir. 2005) (quoting *Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.*, 117 F.3d 655, 666 (2d Cir. 1997)).

[51]    *Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 104 (2d Cir. 2006).  *Accord John Hancock Life Ins. Co. v. Wilson*, 254 F.3d 48, 58 (2d Cir. 2001) ("Like any other contract, courts must interpret an arbitration provision to give effect to the parties' intent as expressed by the plain language of the provision.").

[52]    *Graphtel, Inc. v. RSL Com USA, Inc.*, No. 05 Civ. 9280, 2007 WL 510116, at *1 (S.D.N.Y. Feb. 14, 2007) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985)).

[53]    *Georgia-Pacific Consumer Prods., LP v. International Paper Co.*, 566 F. Supp. 2d 246, 251 (S.D.N.Y. 2008) (quoting *Commander Oil Corp. v. Advance Food Serv. Equip.*, 991 F.2d 49, 53 (2d Cir. 1993)).

dispute.[54]  Thus, "[i]f some claims are non-arbitrable, while others are arbitrable,

then we will sever those claims subject to arbitration from those adjudicable only

in court.  Indeed, there is no reason why, in a proper case, we cannot sever *even a*

*part of a claim*, where that claim raises both arbitrable and non-arbitrable issues."[55]

### B.    Waiver

"[T]here is a strong presumption in favor of arbitration[, and] waiver

of the right to arbitration is not to be lightly inferred."[56]

> In determining whether a party has waived its right to arbitration
> by expressing its intent to litigate the dispute in question, we
> consider the following three factors: "(1) the time elapsed from
> when litigation was commenced until the request for arbitration;
> (2) the amount of litigation to date, including motion practice and
> discovery; and (3) proof of prejudice."[57]

However "[w]aiver of the right to compel arbitration due to participation in

---

[54]    *Rosen v. Mega Bloks Inc.*, No. 06 Civ. 3474, 2007 WL 1958968, at
*5-6 (S.D.N.Y. July 6, 2007).

[55]    *Collins & Aikman Prods. Co. v. Building Sys., Inc.*, 58 F.3d 16, 20 (2d
Cir. 1995) (citing *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985))
(emphasis added).

[56]    *Thyssen, Inc. v. Calypso Shipping Corp., S.A.*, 310 F.3d 102, 104-05
(2d Cir. 2002) (quotation marks omitted).  *Accord PPG Indus., Inc. v. Webster
Auto Parts, Inc.*, 128 F.3d 103, 107 (2d Cir. 1997).

[57]    *Louisiana Stadium & Exposition Dist. v. Merrill Lynch, Pierce,
Fenner & Smith Inc.*, 626 F.3d 156, 159 (2d Cir. 2010) (quoting *Louis Dreyfus
Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 229 (2d Cir.
2001)).

litigation may be found only when prejudice to the other party is demonstrated."[58]

## IV.   DISCUSSION

### A.   Snyder Cannot Be Forced to Arbitrate Disputes Under the IMA

Because Snyder and Wachovia entered into two contracts — embodied in two separate documents — the Court's role is to discern the intent of the parties as evidenced by a fair and reasonable reading of these two contracts.[59] The language of the IRA agreement arbitration clause provides that "disputes between the parties to this agreement shall first be submitted to private binding arbitration."[60]  The parties thereby agreed to arbitrate disputes related to the IRA agreement.  Wells Fargo is correct that the plain language of this arbitration clause is broad.  Despite the absence of the words "any" or "all" disputes in the agreement, this type of arbitration clause has routinely been held to constitute a broad arbitration clause.[61]  This is especially true where, as here, the arbitration provision lacks a restrictive clause such as disputes "under" or "arising under" this

---

[58]     *Id.* (quotation marks omitted).

[59]     *See Rosen*, 2007 WL 1958968, at 11.

[60]     IRA ¶ 11.5.

[61]     *See, e.g.*, *Lipford v. New York Life Ins. Co.*, No. 02 Civ. 0092, 2003 WL 21313193, at *5 (S.D.N.Y. June 9, 2003) (collecting cases).

13

agreement.[62]  Thus, as Snyder admits, there is no question that the types of

allegations that Snyder makes concerning losses from his IRA — and any

allegations that relate to the IRA agreement — must be submitted to arbitration.

Snyder is correct, however, that he cannot be forced to arbitrate claims

relating to the IMA because arbitration can only be required where the parties have

voluntarily agreed to it.[63]  Indeed, just because the IRA agreement contains a broad

arbitration clause, does not mean that Snyder can be forced to arbitrate claims

arising out of a related but distinct contract.  Wells Fargo is correct that under

broad arbitration clauses, courts must compel arbitration in cases "[i]f the

allegations underlying the claims touch matters covered by the parties'"

agreement.[64]  However, this rule has been interpreted to include claims — however

collateral — that arise under a particular agreement to arbitrate where a claim

---

[62]     *See Eatoni Ergonomics, Inc. v. Research in Motion Corp.*, 633 F. Supp. 2d 109, 115-16 (S.D.N.Y. 2009).

[63]     *See Ross v. American Express Co.*, 547 F.3d 137, 143 (2d Cir. 2008) ("[A]rbitration is a matter of contract, and therefore a party cannot be required to submit to arbitration any dispute which [it] has not agreed so to submit.") (quotation marks omitted); *see also In re Am. Exp. Fin. Advisors Secs. Litig.*, — F.3d —, 2011 WL 5222784, at *9 (2d Cir. Nov. 3, 2011).

[64]     *Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys.*, 369 F.3d 645, 654 (2d Cir. 2004) (quotation marks omitted).

involves construction of the agreement or the parties' rights under it.[65]  It has not

been held to include claims arising from a distinct contract not providing for

arbitration.[66]  Here, the parties' rights under each contract can be fully considered

on their own without regard to the other contract and there is no contractual

commitment to arbitrate under the IMA.  Though executed simultaneously, the two

contracts are not intertwined or integral to each other, and all claims — breach of

contract, breach of fiduciary duty, negligence, and unjust enrichment — arising

under each can be pursued independently.  Moreover, the actual damages sought

under the two agreements appear to be distinct — both the IMA account and the

IRA suffered decreases in value as a result of the alleged mismanagement.

　　　　　Moreover, while multiple documents executed at the same time and

concerning the same subject-matter are required to be read together under New

York law, this does not mean that arbitration clauses — or any other particularized

---

[65]　　*Collins & Aikman Prods. Co.*, 58 F.3d at 23 (compelling arbitration for libel claims as "part of an effort to breach a contract" containing a broad arbitration clause).

[66]　　*See Rosen*, 2007 WL 1958968, at *8 ("That there is a 'presumption' of arbitration [arising from broad arbitration clauses] does not alter the fact that the ultimate purpose of the Court's inquiry is to determine whether the parties intended that the particular claims at issue here be arbitrated.").

15

clauses — can be lifted from one document and transferred to another.[67]

Furthermore, the omission of an arbitration clause in the IMA suggests that Snyder *did not* agree to arbitrate disputes under the IMA since the omission of an arbitration clause in an otherwise comparable document strongly suggests that such omission was intentional.[68]  The fact that the IMA contains a merger clause further evidences the intent of the parties not to require arbitration regarding disputes arising under the IMA.[69]  The IMA merger clause must be enforced as "New York law gives full effect to merger clauses."[70]

---

[67]    *See Teletech Europe B.V. v. Essar Servs. Mauritius*, 921 N.Y.S.2d 62, 62 (1st Dep't 2011) (refusing to transpose an arbitration clause from a stock transfer agreement to an escrow agreement); *Smith v. Shields Sales Corp.*, 802 N.Y.S.2d 764, 764 (3d Dep't 2005) (noting that although contemporaneous agreements should be read together, "it does not follow . . . that the arbitration clause in [one] agreement applies to all disputes arising out of any of the documents related to this transaction"); *see also Fit Tech, Inc. v. Bally Total Fitness Holding Corp.*, 374 F.3d 1, 10 (1st Cir. 2004) ("No one can seriously argue that clauses can be plucked at random from one agreement and inserted into the other.").

[68]    Indeed, in all other respects, the IMA is a full and comprehensive agreement that requires no clarifications or supplementation from the IRA agreement.  Wells Fargo fails to explain why the lone term that Wells Fargo believes the parties had implicitly agreed to transpose from one contract to the other concerned the agreement to arbitrate.

[69]    *See* IMA, article XIII ("This Agreement constitutes the entire agreement between the parties.").

[70]    *Roberts v. Edith Roman Holdings, Inc.*, No. 10 Civ. 4457, 2011 WL 2078223, at *3 (S.D.N.Y. May 19, 2011) (citing *Torres v. D'Alesso*, 910 N.Y.S.2d

Moreover, the mere fact that the IMA is not inconsistent with an agreement to arbitrate does not mandate a different result.  While the IMA does not explicitly require adjudication by a court, it is silent with respect to the appropriate forum.  Thus, in the absence of any references to the IRA agreement in the IMA, I cannot infer an intent to be bound by arbitration.  While this result may appear contrary to broad language articulated by the Fifth Circuit in *Personal Security and Safety Systems Incorporated v. Motorola Incorporated*,[71] such language was (1) based on Texas  law, and (2) is "inconsistent with the law requiring this Court to determine the parties' intent as to arbitration."[72]  Moreover, this case is distinguishable from *Bank Julius Baer and Company, Limited v. Waxfield Limited*,[73] inasmuch as that case involved the question of "whether a broad agreement between the parties to arbitrate their disputes was 'still in force,' . . . or was instead vitiated by a later-enacted agreement that contained a forum selection

---

1, 7 (1st Dep't 2010) ("Merger clauses are not mere boilerplate.")).

[71]      297 F.3d 388, 394-95 (5th Cir. 2002) ("[W]here the parties include a broad arbitration provision in an agreement that is 'essential' to the overall transaction, we will presume that they intended the clause to reach all aspects of the transaction — including those aspects governed by other contemporaneously executed agreements that are part of the same transaction.").

[72]      *Rosen*, 2007 WL 1958968, at *6.

[73]      424 F.3d 278, 284 ("[I]f there is a reading of the various agreements that permits the Arbitration Clause to remain in effect, we must choose it.").

17

clause."[74]  The rule established in *Bank Julius* to avoid reading later agreements to override earlier agreements to arbitrate has no applicability where, as here, two contracts — one mandating arbitration and the other silent — are executed simultaneously.  Finally, there is no question that while it may not be the most efficient means of dispute resolution, portions of a claim may proceed under arbitration while others are advanced through litigation when that reflects the agreement of the parties.[75]  Thus, although Snyder's Complaint raises identical issues concerning the handling of his IMA account and his IRA, the resolution of this dispute requires bifurcation in accordance with the two contracts.

## B.    Wachovia Did Not Waive Arbitration Concerning Disputes Under the IRA Agreement

While Snyder may litigate his claims concerning the IMA, claims concerning the IRA agreement must be submitted to arbitration.  Because litigation was only recently commenced, compelling arbitration at this point would not interfere with the litigation or otherwise result in lost time and expense spent in the litigation.  Furthermore, Snyder has not shown why he has suffered or would suffer

---

[74]    *Rosen*, 2007 WL 1958969, at *6 n.4 ("Here, by contrast, our task is to determine the parties' intent in light of the fact that they executed agreements at the same time that contained two different clauses.").

[75]    *Collins & Aikman Prods. Co.*, 58 F.3d at 20 ("[W]e rigorously enforce agreements to arbitrate, even if the result is piecemeal litigation.") (quotation marks omitted).

any prejudice by arbitrating disputes related to losses suffered in his IRA.[76] *First*, the correspondences that Snyder's attorney engaged in prior to litigation consisted of periodic letters back and forth and do not even approach the type of expenditures necessary to show prejudice.[77] *Second*, these exchanges were an attempt to settle the case out of court early, and just as there is a federal policy in favor of arbitration, there is always a strong federal policy in favor of early and amicable settlement.[78]  Thus, Wachovia cannot be faulted for preferring to engage in private settlement discussions rather than rush this case into premature arbitration.  In any event, Snyder has not cited any case where a party's right to insist on arbitration was waived based on *pre-litigation* conduct.

## V.    CONCLUSION

For the foregoing reasons, Wells Fargo's motion is denied in part and granted in part.  The Clerk of the Court is directed to close this motion [Docket No. 10] and a conference is hereby scheduled for January 9, 2012 at 4:30 p.m.  The parties are instructed to bring a proposed scheduling order to the conference in

---

[76]        *See* Pl. Mem. at 6-8.

[77]        *See Louisiana Stadium & Exposition Dist*., 626 F.3d at 159 ("Incurring legal expenses inherent in litigation, without more, is insufficient evidence of prejudice to justify a finding of waiver.") (quotation marks omitted).

[78]        *See McReynolds v. Richards–Cantave*, 588 F.3d 790, 803 (2d Cir. 2009) (noting the "strong judicial policy in favor of settlements").

accordance with the Court's individual rules.

SO ORDERED:

_____
Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            December 19, 2011

20

- **Appearances** -

**For Plaintiff:**

Brian O. Kennedy, Esq.
909 Third Avenue, 28th Floor
New York, NY 10022
(212) 687-0099

**For Defendant:**

Michael P. Manning, Esq.
Yoonsun Chung, Esq.
Greenberg Traurig, LLP
200 Park Avenue
New York, NY 10166
(212) 801-6861/ 2286